# Exhibit A



# U.S. Department of Justice

*Thomas A. Marino*
United States Attorney
Middle District of Pennsylvania

---

| | | |
|---|---|---|
| **William J. Nealon Federal Building** | **Ronald Reagan Federal Building** | **Herman T. Schneebeli Federal** |
| Suite 311 | Suite 220 | Building |
| 235 N. Washington Avenue | 228 Walnut Street | Suite 316 |
| P.O. Box 309 | P.O. Box 11754 | 240 West Third Street |
| Scranton, PA 18501-0309 | Harrisburg, PA 17108-1754 | Williamsport, PA 17701-6465 |
| (570) 348-2800 | (717) 221-4482 | (570) 326-1935 |
| FAX (570) 348-2037/348-2830 | FAX (717) 221-4493/221-2246 | FAX (570) 326-7916 |

Please respond to   Scranton

April 7, 2006

Lawrence S. Krasner, Esquire
239 S. Camac Street
Philadelphia, PA 19107

      RE: U.S. v. David M. Rhodes
           Government's intent to use 404(b) type evidence

Dear Attorney Krasner:

Pursuant to Federal Rules of Evidence, Rule 404(b), please be advised that the government intends to use various statements and bad acts of the defendant at trial. The government believes that many of these statements/acts are admissible independent of Rule 404(b) as being intertwined with the offenses charged, however, out of an abundance of caution we make you aware of the same none the less.

1. On June 24, 2004, Officer Marion Tito of the FCI Schuylkill reported an allegation of workplace violence against David Rhodes. Specifically, Officer Tito stated she had been told by Rhodes that his wife had left him and if she did not come back home with the kids, he was making plans on what he would do to her. Officer Tito also advised in her memorandum that several staff members had advised her that Rhodes made a statement that if they ever see him at the flagpole to turn around and go home. Rhodes also told Officer Tito that he had purchased and AK-47 and had been target practicing. Officer Tito also stated several staff are concerned for their safety.
2. Officer Matthew Munson, of the FCI Schuylkill, indicates that while working with Officer Bixler and Rhodes on June 23, 2004, he observed Rhodes posture himself as though he had a rifle and take aim at Officer Bixler. Prior to Rhodes taking air at Officer Bixler, the two of them had argued about who was going to conduct the fence check. Officer Munson stated he felt uncomfortable with Rhodes behavior.
3. Statement made by Rhodes to Danielle Boris, Unit Secretary, FCI Schuylkill, two or three weeks prior to June 30, 2004. Rhodes approached Ms. Boris outside the shakedown building and stated "If you ever come around the bend and see me standing at the flagpole, turn around for your own safety because it means I'm

2

coming in and shooting." Ms. Boris indicates that after making this statement, Rhodes started to make inappropriate gestures; including inappropriate sounds and an abnormal and eerie laugh (she described it as how Santa Claus would laugh). Ms. Boris indicates that Rhodes had made the same, or similar, comment to her two months prior to this occasion. She also indicates that Rhodes advised that all of his problems stem from the Warden and this (meaning FCI Schuylkill) institution.

4. Statements made to David Costy, Materials Handler Foreman by Rhodes on June 10, 2004. Rhodes informed Mr. Costy his wife was going to leave him and he blames this institution (FCI Schuylkill). Mr. Costy indicates that Rhodes had an angry demeanor. Mr. Costy also indicates that Rhodes disclosed that he was working overtime to purchase a firearm.

5. Senior Officer Reginald Bixler, FCI Schuylkill indicates that on Wednesday, June 16, 2004, Control Center had called for someone to do the fence check. Officer Bixler was assigned as the Activities Officer and Rhodes was assigned as the Compound 3 Officer. On the evening of June 16, Officer Rhodes told Officer Bixler he was not going to do the fence check and told Bixler to do it. Officer Bixler told Rhodes he had other things to do and Rhodes would have to do it. The Lieutenant advised Rhodes to do the fence check. As Rhodes was leaving the Lt's office, Officer Bixler states that Rhodes got on the radio and said, "Bixler wake up." Officer Bixler was standing behind Rhodes and said to Rhodes "I'm standing right here." Officer Bixler states he was standing at the corner by the Lt's office, Rhodes was on the walkway just below him. Bixler saw Rhodes posture himself as though he were holding a rifle and simulated a recoil. Rhodes did not aim at Bixler; he was aiming toward the fence.

6. Captain David Bebow, FCI Schuylkill, states that on Monday, June 28, 2004, a telephone call was placed to Officer Rhodes' residence. After Rhodes was informed he was remain on Administrative Leave status at least until Thursday, July 1, 2004, Rhodes became extremely upset. Rhodes began crying during the conversation and rambled on with statements concerning the Administration at this facility. He continually stated "all they have to do is make it right. The EAP program can't help me. The only one that can make it right is Nash or the new Warden. This Administration has done nothing but mess with me and guess whose voices I hear? Nash, McFadden, and Reish." Rhodes then stated: "Let me ask you this. There are staff out there that talk about weapons all the time and people think nothing of it. I mention buying an AK-47, and they think I'm going to do something. That's against my religion. I'm just afraid I'm going to lose my job. I don't know what I'm going to do."

7. Officer Ronald Atcavage, FCI Schuylkill, indicates that while working the Compound with Rhodes he (Rhodes) has mentioned numerous times that this place (FCI Schuylkill) has ruined his marriage especially the Warden and that he has a list of staff that are on his hit list. Officer Atcavage advises that he saw Rhodes in possession of a piece of paper entitled "hit list" with names of various FCI Schuylkill staff written thereon. Officer Atcavage further states that he has witnessed Rhodes punching doors on several occasions as well as Rhodes pretending to point a rifle at Officer Bixler as he was walking towards the Shakedown shack.

8. Maureen Baird, Camp Administrator, FCI Schuylkill, indicates that on June 25, 2004 while issuing the paperwork to Officer Rhodes regarding his Administrative Leave, Cease and Desist Memo, and his referral to EAP, Rhodes made the following

statements to her: "You people have to make amends for all the wrong you've done to me." And "Reise and McFadden started this years ago and it just continues." Rhodes appeared very angry, he refused to sit down, he turned red and began to raise his voice. Ms. Baird explained to him that he was to leave the property immediately and asked Lt. Henger to escort Rhodes to the Front Lobby.

9. Jenna Long, Captain Secretary, FCI Schuylkill, indicates that on June 25, 2004 at approximately 2:20 p.m., an outside telephone call came into the Lieutenant's Office. Lt. A. Jordan was unable to answer the call; therefore she proceeded to answer the telephone. The individual on the telephone questioned if there was any Lieutenant's in the office. Long stated that Lt. Jordan was in the office, but was currently indisposed. The individual stated "well I really need to talk to him, this is important." Mrs. Long again stated that Lt. Jordan was unable to come to the phone, and asked if she could take a message. The individual then identified himself as "Rhodes," which she assumed referred to Officer D. Rhodes. It was obvious by the quality of the sound that Rhodes was calling from a cellular phone. Rhodes then stated "Since I'm not allowed in the Institution, I'm in front of the Institution, and a Camp inmate just ran into the woods…" At this time the phone line went static for a few seconds, and Mrs. Long was unable to discern what Rhodes was saying. When the phone line cleared, Long heard Rhodes say "So let them deal with it." At this point, Officer Rhodes' phone disconnected. Mrs. Long immediately informed Lt. Jordan of the telephone conversation with Officer Rhodes.

10. On September 2, 2004, Officer Michael Hart, FCI Schuylkill, was assigned to the front lobby when, at approximately 2:55 pm he received an outside phone call from David Rhodes. When Officer Hart accepted the call, Rhodes made a feeble attempt to disguise his voice by lowering it to an almost inaudible level, and asked to speak to Officer M. Durick. Officer Hart was aware that Officer Durick was inside the institution, but could only presume he was in the union office, so the telephone call was forwarded to that extension, and released. Approximately 30 seconds later, Officer Durick cleared door number 1, and exited the institution. Officer Hart never had the opportunity to speak with Officer Durick as he was busy tending to another outside phone call. As Hart finished the last outside call, the computer monitor indicated that there was another outside call coming into the institution so he immediately fielded that call. It was Rhodes calling back to inform Hart that he was still holding for Officer Durick. Officer Hart informed Rhodes that Officer Durick was departing the institution and that he may want to call him at home. The remainder of the conversation went as follows: Rhodes: "Is everyone happy that they don't have to work in fear of their lives because of me?" Hart: "Dave, I don't know anything about that stuff, but I do know that the phone calls are stacking up and I need to get to them." Rhodes: "Yeah, well I'll tell you right now, this isn't over yet either." Hart: "alright … well, I gotta get going Dave." Rhodes then hung up without any further conversation.

11. Officer Rick Ratliff of the FCI Schuylkill was working the front lobby on October 26, 2004 at around 10:30 a.m. when he took an outside phone call from Rhodes, then an ex-staff member. During the course of the conversation, Rhodes mentioned names of several staff members who apparently submitted reports about him in the past and were partly responsible for his termination. Rhodes mentioned retired Warden Reish and Maureen Baird. After mentioning the staff names, he said that he hopes they all get what they deserve, or words to that effect. After making that statement, he

4

stressed that he had no intention of doing anything to them but that he hoped they would find themselves in an unpleasant life situation just like he is in now.

                Very truly yours;

                THOMAS A. MARINO
                UNITED STATES ATTORNEY


_____

Todd K. Hinkley
Assistant U.S. Attorney