```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF PENNSYLVANIA
```

UNITED STATES OF AMERICA          . CRIMINAL NO. 3:CR-05-267
                                  .
        v.                        . (Judge Kosik)
                                  .
JASMIN EDWARDS,                   .
                                  .
        Defendant.

GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S
PRETRIAL MOTIONS

I. The Defendant's Motion to Suppress Rule 404(b)
   And Rule 609 Material Should be Denied

GENERAL LEGAL DISCUSSION OF 404(b)

A general discussion in regards to the admissibility of 404(b) evidence may be helpful, in order to focus the Court's inquiry as to various "bad acts" evidence available to the government for trial herein.[1]

Though non-precedential, the District of New Jersey opinion of United States v. Butch contains a comprehensive discussion of intrinsic versus extrinsic evidence and the legal standard governing admission of Rule 404(b) evidence. United States v. Butch, 48 F.Supp.2d 453 (D. New Jersey 1999).

> As a general rule, all relevant evidence is admissible. Fed. R. Ev. 402. Evidence is relevant if its existence simply has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Ev. 401; see United States v. Murray, 103 F.3d 310, 316 (3d Cir.1997). "Rule 404(b), although viewed as a rule of inclusion rather than exclusion, provides for the exclusion of relevant evidence in ceratin situations." United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir.1996). Rule 404(b) provides, in relevant part:
>
> > Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in

---

[1] Each of the "bad acts" will be serially discussed supra.

order to show action in conformity therewith. It
may, however, be admissible for other purposes,
such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence
of mistake or accident...

Fed. R. Ev. 404(b). As the United States Supreme Court stated in Huddleston v. United States, 485 U.S. 681, 685-86, 108 S.Ct. 1496, 99 L.Ed. 771 (1988):

[Rule 404(b)] generally prohibits the introduction
of evidence of extrinsic acts that might adversely
reflect on the actor's character, unless that
evidence bears upon [another] relevant issue in
the case...

Id. "Thus, the threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." Sriyuth, 98 F.3d at 745-46 (quoting Huddleston, 485 U.S. at 686, 108 S.Ct. 1496).

Recently, in United v. Mastrangelo, 172 F.3d 288, 294 (3d Cir.1999), the Third Circuit succinctly stated the legal standard governing the admission of evidence pursuant to Rule 404(b):

[A]dmissibility under [Rule] 404(b) requires: (1)a
proper evidentiary purpose; (2)relevance under
[Rule] 402; (3)a weighing of the probative value
of evidence against its prejudicial effect under
[Rule] 403; and (4)a limiting instruction
concerning the purpose for which the evidence may
be used.

Id. (citing Huddleston, 485 U.S. at 691-92, 108 S.Ct. 1496; and United States v. Sampson, 980 F.2d 883, 886 (3d Cir.1992)); see also Sriyuth, 98 F.3d at 746; United States v. Palma-Ruedas, 121 F.3d 841, 851 (3d Cir.1997), *reversed on other grounds, sub nom* United States v. Rodriquez-Moreno, — U.S. —, 119 S.Ct. 1239, 143 L.Ed.2d 388, (1999); United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.1998).

"To meet the first requirement and show a proper evidentiary purpose, the government must 'clearly articulate how that evidence fits into a chain of logical inferences' without adverting to a mere propensity to commit crime now based on the commission of crime then." Mastrangelo, 172 F.3d at 294 (quoting Sampson, 980 F.2d at 887). On this issue in *Sampson*, the Third Circuit stated:

[T]he burden on the [G]overnment is not onerous.
All that is needed is some showing of a proper
relevance. Whereupon the trial court must judge

> the [G]overnment's proffered reason, the potential
> for confusion and abuse, and the significance of
> the evidence, and decide whether its probative
> value outweighs its prejudicial effect.

Sampson, 980 F.2d at 887 (discussing Government of Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir.1992).

Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense[.]" *See* Fed. R. Ev. 404(b) (Advisory Committee Note)(citing United States v. Williams, 900 F.2d 823 (5th Cir.1990)); *see also 2 Weinstein's Federal Evidence §404.20[2][b]* (Matthew Bender 2d ed.1997). "Rule 404(b) governs the admissibility of extrinsic evidence only." 2 *Weinstein's Federal Evidence* §404.20[2][b](citation omitted]. The Fifth Circuit's decision in *United States v. Williams* is one of the leading cases on the so-called "extrinsic/intrinsic" dichotomy. In *Williams*, the Fifth Circuit observed:

> The proper test to apply in deciding the
> admissibility of "similar acts" or "other acts"
> evidence [under Rule 404(b)] depends upon whether
> the evidence in question is "intrinsic" or
> "extrinsic" evidence. "Other act" evidence[, as
> contemplated by Rule 404(b),] is "intrinsic" when
> the evidence of the other act and the evidence of
> the crime charged are "inextricably intertwined"
> or both acts are part of a "single criminal
> episode" or the other acts were "necessary
> preliminaries" to the crime charged.

Williams, 900 F.2d at 825 (citations omitted); *see also 2 Weinstein's Federal Evidence §404.20[2][b]*.

As defense counsel points out, the Third Circuit has yet to address the specific issue of what constitutes "intrinsic" versus "extrinsic evidence." Yet, the Government's reliance on United States v. Blyden, 964 F.2d 1375, 1378 (3d Cir.1992), for the proposition that the Third Circuit has embraced the *Williams* definition of "intrinsic," is not entirely misplaced. In *Blyden*, the Third Circuit held that "[w]hen the evidence of another crime is necessary to establish an element of the offense being tried, there is no 'other crime[,]'"falling within the limiting provisions of Rule 404(b), 964 F.2d at 1378; *see also* United States v. Sriyuth, 98 F.3d 739, 747 (3d Cir.1996). The Government, as well as Judge Weinstein's much cited treatise on evidence, have seized upon this language in *Blyden* as proof that the Third Circuit has endorsed the broad definition of "intrinsic" set forth in *Williams*. *See* Gov. 404 Brief at 3; *see also 2 Weinstein's Federal Evidence §404.20[2][b]*.

3

United States v. Butch, 48 F.Supp.2d 453, 456-59.

**APPLICATION OF LEGAL STANDARD TO THE GOVERNMENT'S "BAD ACTS" EVIDENCE**

    **1. Evidence of Prior Bad Acts During Employment**

Officer Matthew Munson, of the FCI Schuylkill, indicates that while working with Officer Bixler and Rhodes on June 23, 2004, he observed Rhodes posture himself as though he had a rifle and take aim at Officer Bixler. Prior to Rhodes taking aim at Officer Bixler, the two of them had argued about who was going to conduct the fence check. Officer Munson stated he felt uncomfortable with Rhodes behavior.[2]

The first question which needs to be addressed is whether the above incident is "intrinsic" or "extrinsic" to the crimes charged. Williams, 900 F.2d at 825. Among others, the defendant is charged with violations of Title 18, United States Code, Section 115 (a)(1)(B). This crime involves the elements of threatening to assault or murder a federal law enforcement officer with the intent to impede, intimidate, or interfere with such official while engaged in the performance of official duties or to retaliate against such official on account of performance of the same. Title 18, U.C.S. § 115 (a)(1)(B).

It is alleged that the defendant made threats against the life of staff located at the Federal Correctional Institution (FCI), Schyulkill. During a telephone conversation with Margaret A. Connors, Employee Services Administrator for the Federal Bureau of Prisons in Philadelphia, Pennsylvania, in regards to his employment termination, Rhodes stated that he was "working overtime to buy an AK-47" and that

---

[2]The Government would proffer each of the incidents of "bad acts" which it will seek to introduce.

he already has, "an arsenal of weapons that he would use". Rhodes made these statements in reference to the individuals Rhodes felt were responsible for his present situation, members of the Executive staff at the FCI who were responsible for his termination. Some weeks later, Rhodes called Bureau of Prisons Director Lapin's office located in Washington, D.C. During this telephone call, Rhodes spoke to Security Specialist Kirk L. Jones. Rhodes explained that he was fired from his job at FCI Schuylkill, and that he needed his job back. He went on to indicate that his wife was leaving him and that he was about to lose his home. He also stated that he was unfairly fired and that if he did not receive his job back that he was going to get an AK-47 and go postal on staff at FCI Schuylkill.

This incident with Officer Bixler was one of the incidents which led to the termination of the defendant. Officer Munson provided the information of the incident to superiores at the FCI.

When the evidence of another crime is necessary to establish an element of the offense being tried, there is no "other crime[,]" falling within the limiting provisions of Rule 404(b). Blyden, 964 F.2d at 1378. The government must prove that the defendant's threat was occasioned as the result of some official duty performed by the officer involved. It is clear that the above listed incident wherein Rhodes pointed a imaginary rifle at Officer Bixler, as reported by Officer Munson, is "inextricably intertwined" with the crime charged. The government must prove Rhodes intent to retaliate against staff, and the proffered evidence is necessary and relevant to prove the same.

5

2. Statement made by Rhodes to Danielle Boris, Unit Secretary, FCI Schuylkill, two or three weeks prior to June 30, 2004. Rhodes approached Ms. Boris outside the shakedown building and stated: "If you ever come around the bend and see me standing at the flagpole, turn around for your own safety because it means I'm coming in and shooting." Ms. Boris indicates that after making this statement, Rhodes started to make inappropriate gestures; including inappropriate sounds and an abnormal and eerie laugh (she described it as how Santa Claus would laugh). Ms. Boris indicates that Rhodes had made the same, or similar, comment to her two months prior to this occasion. She also indicates that Rhodes advised that all of his problems stem from the Warden and this (meaning FCI Schuylkill) institution. Ms. Boris provided this information to her superiors, and the same was included in official records and, in part, led to the termination of Rhodes as a correctional officer.

As with the prior "bad act", this incident is "inexorably intertwined" with the crimes charged. This evidence is both relevant and probative of Rhodes' intent when he made the threatening statements. This incident, as well as the previous one, also give context to later threats by Rhodes. Because this incident is intrinsic to the crimes charged, Rule 404(b) is not implicated.

3. Rhodes made statements to David Costy, Materials Handler Foreman at the FCI, on June 10, 2004. During this conversation, Rhodes told Mr. Costy that his wife was going to leave him and that Rhodes blamed the FCI. Mr. Costy indicates that Rhodes had an angry demeanor. Mr. Costy also indicates that Rhodes disclosed that he was working

6

overtime to purchase a firearm.  This incident was reported to Mr. Costy's superiors and, in part, led to the termination of Rhodes as a correctional officer.

For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

4.  Senior Officer Reginald Bixler, FCI Schuylkill indicates that on , Wednesday, June 16, 2004, the FCI Control Center had called for someone to do the fence check.  Officer Bixler was assigned as the Activities Officer and Rhodes was assigned as the Compound 3 Officer.  Rhodes advised Officer Bixler that he would not do the fence check and that Bixler should do it.  Officer Bixler advised Rhodes that he had other duties and that Rhodes would have to do the fence check.  As Rhodes was leaving Officer Bixler's officer, he got on the radio and said "Bixler, wake up."  Officer Bixler was standing behind Rhodes and said to Rhodes, "I'm standing right here."  Officer Bixler states he was standing at the corner by the Lieutenant's office as Rhodes was on the walkway just below him when Bixler witnessed Rhodes posture himself as though he were holding a rifle and simulating a recoil.  According to Bixler, Rhodes was aiming toward the fence and not toward anyone when he did this.

This incident was reported to Bixler's superiors, and in part, led to Rhodes termination as a correctional officer. For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

5.  Captain David Bebow, FCI Schuylkill, states that on Monday, June 28, 2004, a telephone call was placed to Officer Rhodes' residence.  After Rhodes was informed he was to remain on Administrative Leave status at least until Thursday, July 1, 2004, Rhodes became extremely upset.  Rhodes began crying during the conversation and rambled on with statements concerning the Administration at this facility (meaning the FCI, Schuylkill).  He continually stated "all they have to do is make it right.  The EAP program can't help me.  The only one that can make it right is Nash or the new Warden.  This Administration has done nothing but mess with me and guess whose voices I hear?  Nash, McFadded, and Reish."  Rhodes then stated: "Let me ask you this.  There are staff out there that talk about weapons all the time and people think nothing of it.  I mention buying an AK-47, and they think I'm going to do something.  That's against my religion.  I'm just afraid I'm going to lose my job.  I don't know what I'm going to do."

   This incident was reported to Bebow's superiors.  For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

6.  Officer Ronald Atcavage, FCI Schuylkill, indicates that while working the Compound with Rhodes, he (Rhodes) has mentioned numerous times that this place (meaning the FCI) has ruined his marriage, especially the Warden, and that he has a list of staff that are on his "hit list".  Officer Atcavage advises that he saw Rhodes in possession of a piece of paper entitled "hit list" with names of various FCI

8

Schuylkill staff written thereon. Officer Atcavage further states that he has witnessed Rhodes punching doors on several occasions, as well as, pretending to point a rifle at Officer Bixler as he was walking towards the Shakedown shack.

These incidents were reported to Atcavage's superiors. For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

7. Maureen Baird, Camp Administrator, FCI Schuylkill, indicates that on June 25, 2004, while issuing the paperwork to Rhodes regarding his Administrative Leave, Cease and Desist Memo, and his referral to EAP, Rhodes made the following statements to her: "You people have to make amends for all the wrong you've done to me." And "Reish and McFadden started this years ago and it just continues." Rhodes appeared very angry, he refused to sit down, he turned red and began to raise his voice. Ms. Baird explained to him that he was to leave the property immediately and asked Lt. Henger to escort Rhodes to the Front Lobby.

This incident was reported to Baird's superiors. For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

8. Jenna Long, Captain Secretary, FCI Schuylkill, indicates that on June 25, 2004, at approximately 2:20 p.m., an outside telephone call came into the Lieutenant's Office. Lt. A. Jordan was unable to answer the call, therefore she proceeded to answer the telephone. The

individual on the telephone questioned if there were any Lieutenants in the officer.  Long stated that Lt. Jordan was in the office, but was currently indisposed.  The individual stated "well, I really need to talk to him, this is important."  Mrs. Long again stated that Lt. Jordan was unable to come to the phone, and asked if she could take a message.  The individual then identified himself as "Rhodes," which she assumed referred to Officer David Rhodes.  It was obvious by the quality of the sound that Rhodes was calling from a cellular phone.  Rhodes then stated "Since I'm not allowed in the Institution, I'm in front of the Institution, and a Camp inmate just ran into the woods ..."  At this time the phone line went static for a few seconds, and Mrs. Long was unable to discern what Rhodes was saying.  When the telephone line cleared, Long heard Rhodes say: "so let them deal with it."  At this point, Officer Rhode's telephone disconnected.  Mrs. Long immediately informed Lt. Jordan of the telephone conversation with Officer Rhodes.

This incident was reported to Mrs. Long's superiors.  For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

This incident is relevant to show Rhodes intent in the later telephone threats because this incident was an attempt by Rhodes' to retaliate against prison staff for his removal from the FCI.  This telephone call was received soon after Rhodes was removed from the FCI after having been provided paperwork regarding his Administrative Leave, Cease and Desist Memo and referral to EAP (all discussed in

incident number 7, supra). When Rhodes made the telephone call to the Lieutenant's office to falsely report the escape of a prisoner, he knew that his action would trigger various events in the FCI. These events include a general shutdown and lock-up of the facility as well as head count of the prisoners. Rhodes knew that his actions would lead to additional work for those staff at the FCI, and might result in prisoner unrest or violence, as a result of altering the prisoner population's schedules.

Rhodes' behavior was not only similar to his later charged conduct (using a telephone), this incident evidences his intent to disrupt and retaliate against staff for perceived slights.

For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

9. On September 2, 2004, Officer Michael Hart, FCI Schuylkill, was assigned to the front lobby when, at approximately 2:55 p.m., he received an outside phone call from Rhodes. When Officer Hart accepted the call, Rhodes made a feeble attempt to disguise his voice by lowing it to an almost inaudible level, and asked to speak to Officer M. Durick. Officer Hart was aware that Officer Durick was inside the institution, but could only presume he was in the union office, so the telephone call was forwarded to that extension, and released. Approximately 30 seconds later, Officer Durick cleared door number 1, and exited the institution. Officer Hart never had the opportunity to speak with Officer Durick as he was busy tending to another outside phone call. As Officer Hart finished the last outside call, the

11

computer monitor indicated that there was another outside call coming into the institution so he immediately fielded that call. It was Rhodes calling back to inform Officer Hart that he was still holding for Officer Durick. Officer Hart informed Rhodes that Officer Durick was departing the institution and that he may want to call him at home. The remainder of the conversation went as follows: Rhodes: "Is everyone happy that they don't have to work in fear of their lives because of me?" Officer Hart: "Dave, I don't know anything about that stuff, but I do know that the phone calls are stacking up and I need to get to them." Rhodes: "Yeah, well I'll tell you right now, this isn't over yet either." Officer Hart: "Alright ... well, I gotta get going, Dave." Rhodes then hung up without any further conversation.

For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

10. Officer Rick Ratliff of the FCI Schuylkill was working the front lobby on October 26, 2004 at around 10:30 when he took an outside phone call from Rhodes, then an ex-staff member. During the course of the conversation, Rhodes mentioned names of several staff members who apparently submitted reports about him in the past and were partly responsible for his termination. Rhodes mentioned retired Warden Reish and Maureen Baird. After mentioning the staff names, he said that he hopes they all get what they deserve, or words to that effect. After making that statement, he stressed that he had no intention of doing anything to them but that he hoped they would find themselves in an unpleasant life situation just like he is in now.

12

For all the reasons stated above, this incident is intrinsic to the crimes charged and is admissible to prove intent as well as to place the charged threats in context.

**2. Evidence of Possession of Guns and Knives**

When the defendant was arrested at his residence he was in possession of various firearms (as per Counts 2 and 4 of the Second Superseding Indictment) as well as knives. The defendant wishes to suppress this evidence, and toward that end cites the Third Circuit case of United States v. Himelwright. Himelwright was charged with a violation of Title 18, United States Code, section 875©. The fact that Himelwright was in possession of two firearms was allowed by the District Court based on Rule 404(b). In reversing, the Third Circuit noted that "at best, the fact that Himelwright was found in possession of the firearms the day after he placed the (threatening) calls is indicative of his capacity to carry out the threats. Evidence of capability, however, is not only unnecessary to satisfy the elements of section 875( c); it is likewise not included among the categories of admissibility to which Rule 404(b) is addressed." United States v. Himelwright, 42 F.3d 777 at 783 (3d Cir. 1994).

In the case at bar, the defendant is not only charged with a violation of Title 18, U.S.C. §875©, but with two counts of Title 18, U.S.C. §924©. The elements of Title 18, U.S.C. §924© includes possession of the firearms in furtherance of the underlying crime. *See* 18 U.S.C. §924©. The proffered case of Himelwright is factually and legally distinguishable because "possession" of the firearms is an element which the government must prove. For this same reason,

13

evidence of Rhodes' possession at the time of his arrest, during the time-frame of the alleged threats, as well as, prior to his illegal conduct is all admissible.

Evidence that Rhodes possessed the firearms at the time of his arrest, as well as, during and prior to his alleged illegal conduct, is relevant and probative of one of the elements the government must prove at trial. This evidence is therefore not subject to Rule 404(b).

In regards to the knives possessed by Rhodes at the time of his arrest, they likewise are admissible. When the defendant was arrested he had a large folding knife in his pocket as well as a large knife secreted under the driver's seat of his vehicle. What is more, a number of knives were located in his home. These other knives were located as if they were strategically placed for the purpose of easy access and use. At least one was found under a pillow on one of the beds in the house. The government would proffer that the existence and placement of these knives are relevant and admissible on two separate theories. First, to rebut any claim by Rhodes that he lacked mens rea to commit the threats. After all, these weapons were found by police after his arrest secreted throughout his home. If he intended to carry out these threats than he might have placed these weapons with an idea that they would be at hand when police came to arrest him. What is more, he must have known that the fact of the threats themselves would bring police to his residence. This can be further demonstrated by the fact that when police arrived (with no prior warning, pursuant to a sealed arrest and search warrant), the defendant was armed with a semi-automatic .45 caliber pistol on his hip and a large folding knife in

his pocket. The second theory under which these knives would be admissible is to demonstrate that he not only planned to follow through on his threats, but was prepared to do so. All the above facts could lead to the same conclusion. The strategic placement of the weapons on his person, in his car and throughout his home, was in preparation for the time that authorities would necessarily come to his home after the planned attack on the Federal Correctional Institution.

### 3. Evidence of Defendant's Resist to Arrest

At the time of the defendant's arrest he struggled with the Pennsylvania State Police. The evidence will show that two uniformed Pennsylvania State Police Troopers approached the defendant's home and knocked on his front door. The defendant answered the door and turned his body such that his .45 caliber pistol was facing away from the Troopers. Once they identified themselves, the Troopers informed Mr. Rhodes that they had a warrant for his arrest. One of the Troopers placed his hand on Rhodes shoulder and immediately thereafter a struggle occurred as Rhodes would not submit. Rhodes ended up face down with his arms curled under his body and would not submit to the Trooper's request to place his hands where they could be seen and handcuffed. During the struggle one of the Troopers noticed that Rhodes was armed and removed the pistol from his hip holster and threw it to the ground. After a few minutes, Rhodes finally stopped struggling and submitted to his arrest.

Resistance to arrest is probative of consciousness of guilt. See U.S. ex rel. O'Connor v. State of N.J., 405 F.2d 632 (C.A.N.J. 1969)("In his classic treatise on evidence, Professor Wigmore notes

15

that: It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment ... are admissible as evidence of consciousness of guilt, and thus of guilt itself).

**4. Evidence of Psychiatric and Psychological Counseling**

The defendant wishes to suppress any mention of the defendant's psychological background including the fact that he sought treatment. While the government does not intend to introduce evidence from any psychologist who may have treated the defendant, reference to the fact that such counseling was offered to the defendant through the Employee Assistance Program (EAP Program) will likely be introduced during the Government's case in chief. Specifically, the Government will introduce evidence that the defendant was offered an opportunity to participate in the EAP Program. What is more, various documents provided to the defendant during his administrative proceedings make reference to the EAP Program and the fact that counseling was available to the defendant. Testimony may be elicited during trial that during various statements made by the defendant, he also made reference to his psychological treatment. Further, in a written response to the proposed termination letter to Warden John Nash, the defendant made reference to his seeking assistance for his behavioral issues.

These references are not prejudicial to the defendant and are necessary to the Government's case in order to put into context various conversations held with and by the defendant.

The same should not be suppressed.

Additionally, the Government reserves the right to cross examine the defendant with statements made during psychological examination, treatment or counseling should he testify inconsistently with the same.

II. CONCLUSION

For the foregoing reasons, it is respectfully requested that the defendant's pretrial and In Limine motions be denied.

Respectfully submitted,

THOMAS A. MARINO
UNITED STATES ATTORNEY

/s/ Todd K. Hinkley

Todd K. Hinkley
Assistant U.S. Attorney
Office of the U.S. Attorney
U.S. Post Office and Courthouse
Scranton, Pennsylvania 18501
570-348-2800

Dated: July 27, 2006